Keith CREWS, Appellant,

v.

UNITED STATES, Appellee.

No. 8507.

District of Columbia Court of Appeals.

Argued En Banc Oct. 5, 1977.

Decided June 14, 1978.

W. Gary Kohlman, Public Defender Service, Washington, D. C., for appellant.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and Carl S. Rauh, Principal Asst. U. S. Atty., John A. Terry, Stuart M. Gerson and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, YEAGLEY, HARRIS, MACK and FARREN, Associate Judges.

FERREN, Associate Judge:

On February 16, 1977, a division of this court, by a vote of 2–1, affirmed appellant Keith Crews' conviction for armed robbery (D.C.Code 1973, §§ 22–2901 and –3202). *Crews v. United States*, D.C.App., 369 A.2d 1063 (1977). On May 12, 1977, we granted appellant's petition for rehearing en banc and vacated the judgment of February 16. The sole question at the first hearing, and upon rehearing en banc, is whether the robbery victim's in-court identification of appellant Crews should have been suppressed as evidence obtained by official exploitation of an unlawful arrest, in violation of his Fourth Amendment rights.

On the facts of this case, we hold that the in-court identification should have been excluded from appellant's trial. His conviction accordingly must be reversed.

Our analysis proceeds, in Part I, with an explication of the facts and the trial court proceedings, followed in Part II with a discussion of the threshold issue: whether the case concerns merely the suppression of evidence (as appellant contends) or actually amounts to an untenable request for dismissal of the charges (as the government maintains). After concluding that "suppression of evidence" is the correct characterization, we turn to the question of the appropriateness of suppression. Part III addresses the Fourth Amendment exclusionary rule—its history (Section A) and relevance to the facts of this case (Section B), followed by analysis and application of the three commonly advanced exceptions to the rule: "independent source" (Section C), "inevitable discovery" or "hypothetical independent source" (Section D), and "attenuation" (Section E). After finding these exceptions to be inapplicable, we conclude by holding that the police conducted an unconstitutional "investigatory arrest." The evidentiary results of such an arrest—including the contested identification testimony here—cannot lawfully be admitted at trial.

## I. FACTUAL BACKGROUND AND TRIAL COURT PROCEEDINGS

On January 3, 1974, at approximately 11:30 a. m., a woman was accosted in a restroom in the vicinity of the Washington Monument. The assailant, a 15- to 18-year-old, slender, black male with a smooth complexion, approached the victim's stall and demanded $10.00. The victim initially refused, but she surrendered the sum when the robber revealed a gun. After requesting $10.00 more and ascertaining that the woman did not have it, the young man gained entry to the stall and made sexual advances and requests. The victim pleaded with the assailant to stop and to leave. He soon did, warning her as he departed not to emerge from the restroom for 20 minutes; otherwise, he said, he would shoot her. The woman complied, then reported the incident to the police.

Two other woman were similarly robbed and assaulted in the same Monument restroom during the mid-afternoon hours of January 6, 1974. Threatening the women with a broken bottle, the assailant (whose description matched the January 3 robber) compelled them to turn over $20.00, then departed, again advising the victims not to leave for 20 minutes. The women reported this incident to the police.

Three days later, in the early afternoon of January 9, 1974, Officer David Rayfield of the United States Park Police observed appellant in the area of the Washington Monument concession stand. Aware of the January 3 and 6 robberies and of a police "lookout" describing the perpetrator as a young black man 15–18 years old and slender in build—and believing that appellant resembled this description—the officer and his partner, Officer Barg, approached appellant. Upon being questioned, appellant disclosed that his name was Keith Crews, his age was sixteen, and he was not in school because he had "walked away." After this three-to-five-minute encounter, during which the officers apprised Mr. Crews of his likeness to the robbery suspect's description, the officers allowed him to go on his way. They watched him enter a nearby men's room.

Moments later, Officer Rayfield saw and summoned James Dickens, a tour guide. The officer knew that Mr. Dickens had seen "a subject" in the area on January 3, the date of the first robbery. When appellant exited from the men's room, Mr. Dickens told Officer Rayfield that appellant looked like the person he had observed on January 3. His suspicions bolstered by this report, the officer again stopped and detained Mr. Crews. This time, Officer Rayfield summoned Detective Ore of the United States Park Police, the investigator assigned to these robberies, in order to have him view the individual who resembled the lookout description. Detective Ore arrived ten to fifteen minutes later. When inhospitable weather frustrated the detective's intent to obtain on-the-scene photographs for display to the robbery victims, he transported Mr. Crews to headquarters. The police held him for one hour, obtained the desired photographs, and then released him.

At a photographic array session conducted the next day, the victim of the first crime identified appellant. One of the two January 6 victims made a like identification on January 13. On January 16, the court ordered appellant Crews (who apparently had been reapprehended) to appear in a lineup on January 21, where he was positively identified by the two women who had made the photographic identifications.

The grand jury returned an indictment on February 22, 1974, charging Keith Crews with two counts of armed robbery (D.C. Code 1973, §§ 22–2901, –3202), two counts of robbery (D.C.Code 1973, § 22–2901), one count of attempted armed robbery (D.C. Code 1973, §§ 22–2902, –3202), and three counts of assault with a dangerous weapon (D.C.Code 1973, § 22–502). On April 22, 1974, after a hearing on appellant's motion to suppress, the trial court determined that because the government lacked probable cause to arrest, it could not introduce the photographic or lineup identifications into evidence. The court, however, decided to permit the in-court identification.

Trial commenced immediately. Defendant Crews interposed alibi defenses to all charges. On the next day, April 23, the jury returned verdicts of not guilty on all counts but the first. He was convicted of armed robbery founded upon the events of January 3.[1] Pursuant to the Youth Corrections Act, 18 U.S.C. § 5010(a) (1970), the trial judge sentenced Keith Crews to four years' probation. He now appeals the conviction, maintaining that the first victim's in-court identification was tainted by the illegality of his arrest and, as a result, was necessarily subject to suppression by virtue of the Fourth Amendment to the Constitution of the United States.

## II. SUPPRESSION OF EVIDENCE VERSUS DISMISSAL OF THE CHARGE

Appellant casts his appeal in suppression-of-evidence terms. The government, how-

---

1. Although appellant was but sixteen years old, he was prosecuted as an adult in the Criminal Division by virtue of D.C.Code 1973, § 16–2301(3)(A), which excludes from the definition of "child" (for purposes of Family Division jurisdiction),

An individual who is sixteen years of age or older and—
(A) charged by the United States Attorney with . . . robbery while armed . . .

ever, maintains that there is no "evidence" to be suppressed; it argues that appellant's goal should be characterized, more realistically, as prevention of his prosecution with consequent dismissal of the charges. It follows, according to the government, that appellant's effort runs afoul of the long-standing, well-recognized, and still vital principle that an illegal arrest cannot serve to bar a prosecution or nullify a conviction that results from a fairly conducted trial. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Accordingly, we must first interpret the meaning and scope of the *Frisbie-Ker* doctrine and then determine whether the relief sought by appellant runs contrary to the constitutional authority of those two cases.

### A. *The Frisbie-Ker Doctrine*

■ In *Frisbie v. Collins, supra*, and *Ker v. Illinois, supra*, the Supreme Court was confronted with claims that the forcible abduction of the defendants by government agents for the purpose of subjecting them to the jurisdiction of the respective trial courts violated due process. Defendants accordingly claimed that their convictions had to be voided. In both cases the Court held that the Constitution did not require the state courts to decline jurisdiction.

[T]he power of a court to try a person for a crime is not impaired by the fact that he [has] been brought within the court's jurisdiction by reason of a "forcible ab-

duction." . . . [D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will. [*Frisbie, supra*, 342 U.S. at 522, 72 S.Ct. at 512 (footnote omitted).]

The holdings of the Court are actually quite clear and simple. "These cases established that a criminal court could exercise jurisdiction over a defendant however his presence has been obtained." 88 Harv.L.Rev. 813, 815 (1975).[2] Clarity and simplicity notwithstanding, the continuing validity of *Frisbie-Ker* is frequently questioned. We therefore must resolve the dispute over *Frisbie-Ker's* current status.

At least one commentator has maintained that developments in due process doctrine since *Frisbie*—especially the evolution of the exclusionary rule—cast serious doubt upon the present validity of *Frisbie-Ker*. See Pitler, *The Fruit of The Poisonous Tree, Revised and Shepardized*, 56 Calif.L. Rev. 579, 599–601 (1968). At least one court, in fact, has endorsed this position by specifically rejecting *Frisbie-Ker* in a case of flagrant international abduction and torture. *United States v. Toscanino*, 500 F.2d 267, 273–75 (2d Cir. 1974).[3] Two other cir-

---

**2.** The Supreme Court recently has offered its own summaries of the *Frisbie-Ker* principle. In *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975), the Court observed "the established rule that illegal arrest or detention does not void a subsequent conviction." Similarly, in *Stone v. Powell*, 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976), the Court acknowledged the "proposition that judicial proceedings need not abate when the defendant's person is unconstitutionally seized." These two expressions reveal an important, often overlooked, aspect of the *Frisbie-Ker* doctrine: due process *tolerates* such compulsory attendance at trial; it does not *require* a court to decline jurisdiction or dismiss a case. But *Frisbie-Ker* does not limit a court's power to reject jurisdiction on nonconstitutional grounds. The *Ker* court, in fact, specifically stated that it would not be adverse

to a trial court's refusal to sanction the prosecution of an abducted defendant on other than due process grounds; "the decision of that question is as much within the province of the state court, as a question of common law, or of the law of nations, of which that court is bound to take notice, as it is of the courts of the United States." *Id.* 119 U.S. at 444, 7 S.Ct. at 229. Accordingly, *Frisbie-Ker* does not foreclose the court's option to refuse to conduct the trial of a forcibly abducted defendant in the exercise of its supervisory powers over the administration of criminal justice. *See United States v. Toscanino*, 500 F.2d 267, 276 (2d Cir. 1974).

**3.** Although the *Toscanino* court clearly repudiated *Frisbie-Ker*, the court's conclusion that it lacked jurisdiction was also supported by at

cuit court opinions have referred to the criticism and possible decline of *Frisbie-Ker's* authority. *United States v. Edmons*, 432 F.2d 577, 583 (2d Cir. 1970); *Government of the Virgin Islands v. Ortiz*, 427 F.2d 1043 (3d Cir. 1970). Nonetheless, a greater number of circuits has acknowledged the endurance of the doctrine. *United States v. Herrara*, 504 F.2d 859 (5th Cir. 1974); *United States v. Cotten*, 471 F.2d 744, 748–49 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *United States ex rel. Calhoun v. Twomey*, 454 F.2d 326 (7th Cir. 1971); *United States v. Sherwood*, 435 F.2d 867 (10th Cir. 1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); *Sewell v. United States*, 406 F.2d 1289 (8th Cir. 1969). *See also United States v. Friedland*, 441 F.2d 855 (2d Cir.), *cert. denied*, 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971). Most important, the Supreme Court recently has indicated that *Frisbie-Ker* is still good authority. *Stone v. Powell*, 428 U.S. 465, 485, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Consequently, we feel bound by the *Frisbie-Ker* principle.

 While we acknowledge such continuing validity, we also must underscore

least two nonconstitutional rationales: (1) the federal court's supervisory power over criminal justice, with reference to preserving its own dignity, and (2) specific treaty violations. The Second Circuit specifically distinguished both *Frisbie* and *Ker* on these grounds. Furthermore, one commentator has pointedly observed that the abandonment of *Frisbie-Ker* was wholly unnecessary on the egregious facts of *Toscanino*. 88 Harv.L.Rev. 813, 817 (1975).

4. We should note that *Ker* itself did not foreclose reliance upon a constitutional violation as the basis for seeking a remedy other than dismissal of a prosecution (*e. g.*, the suppression remedy). By way of limitation upon its holding, the Court stated:

> We do not intend to say that there may not be proceedings previous to the trial, in regard to which the prisoner could invoke in some manner the provisions of this clause of the Constitution, but, for mere irregularities in the manner in which he may be brought into the custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in

that *Frisbie-Ker* does not conflict with, let alone delimit, the exclusionary rule of the Fourth Amendment announced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and extended to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Each principle reigns supreme in its own sphere: *Frisbie-Ker* in holding that under the due process clause, the conduct of a prosecution is not prevented by, nor is a conviction voided by, the illegal seizure of the person of the defendant; and *Weeks-Mapp* in holding that under the Fourth and Fourteenth Amendments, illegally seized evidence must be excluded from federal and state criminal prosecutions. In summary, *Frisbie-Ker* deals with a court's capacity to pursue the overall criminal process against a particular defendant, without regard to the evidence that may be introduced. *Weeks-Mapp*, on the other hand, treats only a limited portion of the criminal process—the admission of particular evidence against a defendant who is properly before the court. Thus, the two doctrines, as such, do not conflict. *See M.A.P. v. Ryan*, D.C.App., 285 A.2d 310, 315 (1971); *District of Columbia v. Perry*, D.C. App., 215 A.2d 845, 847 (1966).[4]

a regular indictment. [*Id.*, 119 U.S. at 440, 7 S.Ct. at 227.]

Also, it is important to stress that the *Frisbie-Ker* doctrine is specifically narrowed by the necessity that all trials, including those which do proceed despite illegal apprehensions, must be "fair" and "in accordance with constitutional procedural safeguards." *Frisbie, supra*, 342 U.S. at 522, 72 S.Ct. at 512. The doctrine clearly was not intended to abrogate the Fourth Amendment for trials conducted under its authority. We therefore find in the very language of the two seminal cases additional support for our conclusion that *Frisbie-Ker* does not encroach upon the exclusionary rule of *Weeks-Mapp* and must be understood and applied in light of that rule.

Finally, there is another significant limitation on *Frsbie-Ker*. While that doctrine allows the government to pursue a prosecution, with properly obtained evidence, against an illegally arrested defendant, it by no means infringes on a defendant's Fourth Amendment "right to be released from unlawful custody following an arrest made without a warrant or without probable cause." *Brown v. Illinois*, 422 U.S. 590, 601 n.6, 95 S.Ct. 2254, 2261, 45 L.Ed.2d

We now inquire whether the present case is better characterized by reference to *Frisbie-Ker* or to *Weeks-Mapp*.

### B. *Due Process Dismissal or Fourth Amendment Exclusion?*

The government contends that appellant actually seeks a due process dismissal, precluded by *Frisbie-Ker*, because (1) the in-court identification does not constitute suppressible "evidence", and because (2) dismissal of the charges is the necessary consequence of granting the relief sought. We reject both government arguments. We perceive appellant's claim to be merely the assertion of a constitutional right to exclusion of illegally obtained evidence. Because (as indicated above) such Fourth Amendment relief is consonant with *Frisbie-Ker*, this latter doctrine poses no impediment to the appeal.

 Implicit in the government's first argument (that there is no "evidence" to suppress) is a purported distinction between types of evidence for exclusionary rule purposes. Legal precedent, however, is to the contrary. For the purpose of determining whether evidence is subject to suppression,

> there is "no reasonable or logical basis for any distinction between inanimate (tangible) and animate (testimonial) evidence." [*People v. Dentine*, 21 N.Y.2d 700, 703, 287 N.Y.S.2d 427, 429, 234 N.E.2d 462, 463 (1967) (Fuld, C. J., dissenting). *See United States v. Schipani*, 289 F.Supp. 43, 59 (E.D.N.Y.1968).]

It is beyond question that testimony is a proper target for Fourth Amendment suppression. Indeed, the Fourth Amendment landmark, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), so held.[5] Numerous other cases, in fact, have also made clear that all kinds of identification evidence, whether in the form of testimony about a pretrial lineup, showup, or photographic array, or of testimony confirming an in-court identification, are the proper subject of a suppression motion under the Fourth, Fifth, and Sixth Amendments. *See Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gatlin v. United States,* 117 U.S.App.D.C. 123, 130, 326 F.2d 666, 673 (1963). *See also Payne v. United States,* 111 U.S.App.D.C. 94, 97, 294 F.2d 723, 726 (1961).

 We therefore cannot endorse the government's argument that the suppression of courtroom identification testimony necessarily transgresses *Frisbie-Ker* because it is not "evidence." No one disputes that in-court identification testimony presupposes the defendant's presence at trial, and that in this sense the evidence cannot ripen until trial. But the converse is not true; contrary to the government's contention, exclusion of identification testimony

416 (1975). Undoubtedly, unless the government possesses adequate untainted evidence of probable cause, a forcibly abducted defendant is entitled to habeas corpus relief.

5. "Thus, verbal evidence which derives so immediately from unlawful entry and an unauthorized arrest as the officer's action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of [an] unwarranted intrusion." *Id.* 371 U.S. at 485, 83 S.Ct. at 416 (footnote omitted). *See also Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (testimony at first trial excluded from second trial); *Abbott v. United States,* D.C.Mun.App., 138 A.2d 485 (1958) (testimony of officers regarding illegally obtained observations and admissions is excludable); *Smith v. United States,* 120 U.S.

App.D.C. 160, 344 F.2d 545 (1965) (testimony of two witnesses that defendants sold them stolen property is excludable); *Edwards v. United States,* 117 U.S.App.D.C. 383, 330 F.2d 849 (1964) (testimony of witness whose name was unlawfully obtained is suppressible).

In *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the Supreme Court specifically reaffirmed *Wong Sun's* holding that "verbal evidence," like "tangible fruits," can be subject to Fourth Amendment suppression. *Ceccolini, supra* at 1059. The Court noted, however, that attenuation analysis may make "verbal evidence" less suppressible under certain circumstances than "physical evidence." *See* text in Part III.E.3. and note 37, *infra.*

does not require that a defendant be absent from trial, in derogation of *Frisbie-Ker*. The exclusionary principle merely prevents a particular witness from testifying. Thus, only the exclusion of evidence, not the prevention or nullification of a prosecution, is directly at stake. In line with compelling authority, we find suppressible evidence at issue.[6]

■■■ The government attempts, second, to erect another *Frisbie-Ker* roadblock by contending that because dismissal must inevitably result from the suppression of the complainant's courtroom identification testimony. *Frisbie-Ker* is properly invocable to preserve the identification and thus preclude the forbidden dismissal. Again, the government misses the target. *Frisbie-Ker* held that an illegal arrest, in itself, does not furnish a due process basis for a court's refusal of jurisdiction and the consequent dismissal of a criminal prosecution. The Supreme Court, however, did not hold that if suppression of illegally obtained evidence would result in dismissal of a case for lack of sufficient evidence overall, then the evidence must be admitted—despite the

Fourth Amendment—to keep the case alive. And yet the government's argument, in effect, is precisely that.

"[T]he exclusion of evidence resulting from an illegal arrest does in some cases effectively deprive the state of any possibility of convicting the defendant." 88 Harv. L.Rev. 813, 816 n.22 (1975). Yet, the doctrine of *Frisbie-Ker* is not concerned with such indirect, "effective" preclusion of the government's opportunity to prevail. *Frisbie-Ker*, rather, is concerned only with dismissals directly attributable to the fact of the illegal arrest itself, without regard to the government's evidence. Were the government's argument to be accepted, the exclusionary rule would be substantially vitiated, for the consequence of suppression is often the impossibility of successful prosecution. The Supreme Court, however, has adopted the exclusionary rule and continued to apply it with full awareness of the *Frisbie-Ker* doctrine and of the primary criticism that "[t]he criminal is to go free because the constable has blundered." *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587, cert. denied, 270 U.S. 657, 46 S.Ct. 353, 70

---

**6.** The government cites *Payne v. United States,* 111 U.S.App.D.C. 94, 294 F.2d 723 (1961), where the court rejected appellant's Fourth Amendment challenge to an in-court identification by the complaining witness:

> The consequence of accepting appellant's contention in the present situation would be that [the witness] would be forever precluded from testifying against [the appellant] in court, merely because he had complied with the request of the police that he come to police headquarters and had there identified [the appellant] as the robber. Such a result is unthinkable. The suppression of the testimony of the complaining witness is not the right way to control the conduct of the police, or to advance the administration of justice. The rights of the accused in a case like the present are adequately protected when the complaining witness takes the stand in open court, for examination and cross-examination. *Cf. Frisbie v. Collins,* 1952, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541. [*Payne v. United States, supra* at 98, 294 F.2d at 727.]

Insofar as that opinion implies a basis for distinction between suppressibility of tangible and testimonial evidence, it cannot be reconciled with the weight of authority. Further, if the court's intention was to isolate in-court identifications as a special category exempt from the

demands of the exclusionary rule, we can, as noted above, find no support for that conclusion. Finally, perhaps some readers will understand the *Payne* court to have implied that the reliability of in-court identification testimony provides a reason for its exemption from the exclusionary rule. The reliability of evidence is irrelevant in determining whether it is of a character suitable for suppression under the Fourth Amendment.

> The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment. *To make an exception for illegally seized evidence which is trustworthy would fatally undermine these purposes.* [*Davis v. Mississippi,* 394 U.S. 721, 724, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676 (1969) (emphasis added).]

*See* the text at note 16, *infra.* Indeed, much tangible evidence (*e. g.,* narcotics) which commonly is suppressed is of the highest probative value—as much so as testimonial evidence. Therefore, we reject *Payne's* intimation that for exclusionary rule purposes, in-court identifications are categorically separable (on the ground of high reliability) from other forms of evidence, and that their suppression somehow runs afoul of the *Frisbie-Ker* doctrine.

L.Ed. 784 (1926). We therefore find the government's "necessity of dismissal" argument to be without merit.[7]

In summary, we hold that the principles of *Frisbie* and *Ker* present no barrier to appellant Crews in seeking the exclusion of illegally obtained identification evidence. We therefore turn to the overriding issue: the appropriateness of Fourth Amendment suppression of the in-court identification.

### III. THE FOURTH AMENDMENT EXCLUSIONARY RULE

In order to resolve the Fourth Amendment issue, we seek guidance from the origin and development of the exclusionary rule.

#### A. *Brief History of the Exclusionary Rule*

In 1914, the Supreme Court adopted the exclusionary rule in *Weeks v. United States, supra.*[8] There, the Court held that a proscription against governmental use of illegally obtained evidence was vital to preservation of Fourth Amendment rights. Six years later, in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Court announced that not only direct products of official illegality but also secondary,*i. e.,* derivative, results must be excluded under this Fourth Amendment rule. In announcing this extension of the rule, the Court stated a limit on how far the rule extended. It fashioned the first of the exceptions: "If knowledge of [facts] is gained from an *independent source* they may be proved like any others . . . ." *Id.* at 392, 40 S.Ct. at 183 (emphasis added). Almost twenty years later, in *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Court reconfirmed the principle that derivative products are suppressible, characterizing them as the "fruits of the poisonous tree." *Id.* 308 U.S. at 340–41, 60 S.Ct. 266. The Court then announced a second exception to the exclusionary rule: the connection between the illicit official conduct and the evidence yielded "may have become so *attenuated* as to dissipate the taint." *Id.* at 341, 60 S.Ct. at 268 (emphasis added).

After more than another two decades, in 1963, the Court issued its landmark opinion in *Wong Sun, supra,* in which it reviewed and endorsed the holdings of *Silverthorne, supra,* and *Nardone, supra,* before endeavoring more specifically to describe where the boundary line between exclusion and admission should be drawn.[9] In the oft-quoted statement that characterizes *Wong Sun,* the Court opined:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment

---

**7.** We also note that the present case is distinguishable from those which have expressed disapproval at the prospect of

> life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be . . .. [*United States v. Friedland,* 441 F.2d 855, 861 (2d Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971).]

Appellant receives no immunity by virtue of our decision in this case. As will become apparent, we merely require the suppression of specifically and sufficiently tainted "fruits" of a Fourth Amendment violation. *Friedland, supra,* and similar cases cast no doubt on the justifiability and rationality of such a result. *See, e. g., Bond v. United States,* D.C.App., 310 A.2d 221 (1973); *Gissendanner v. Wainwright,* 482 F.2d 1293 (5th Cir. 1973).

**8.** In *Weeks* the Court promulgated an exclusionary rule for the federal courts. Later, the Court held that although the Fourth Amendment was incorporated into the Fourteenth Amendment, the exclusionary rule would not be applied to the states. *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Court recanted and imposed the exclusionary rule on state law enforcement officials and courts. The Fourth Amendment, of course, is directly applicable in the District of Columbia.

**9.** *Wong Sun* was not intended to expand the exclusionary rule but rather to delimit the category of "tainted fruits." *United States v. Friedland, supra* at 860.

of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). [371 U.S. at 487–88, 83 S.Ct. at 417.]

In all cases involving secondary (derivative) "fruits," such as the identification challenged in the present case, this standard is the inevitable point of departure and basis for assessment.

In recent years, the exclusionary rule has endured a hailstorm of criticism, and yet the foundational principles sketched above have generally survived.[10] Recently, there has been an increasing emphasis on implementation of the rule by reference to its underlying purposes. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[11] We take that approach in the present case.

### B. The Fourth Amendment Violation in the Present Case

The trial judge found that when the officers arrested Keith Crews on the morning of January 9, 1974, and transported him to police headquarters, they lacked probable cause to arrest him for any crime. Accordingly, the judge suppressed the photographic array and lineup identifications. He did not, however exclude the courtroom identification, for he concluded that there was an "independent source" for it.

Appellant maintains that the court either did not engage in, or at least did not appropriately conduct, the Fourth Amendment inquiry in arriving at the "independent source" conclusion. The government takes issue with the court's probable cause determination; but, assuming the lack of probable cause to arrest, it urges this court to affirm the finding of an "independent source" for the courtroom identification.

■■■ We are compelled to accept the trial court's appraisal that there was no probable cause to arrest.[12] The government did not appeal that determination and the resulting evidentiary suppression. In any event, the trial judge's conclusion was correct on the facts.[13] Keith Crews' presence at the scene of the robberies, his minimal resemblance to the quite general description of the assailant, and his weak, very tenuous identification by tour guide Dickens, did not constitute probable cause to believe that he had participated in the robberies and assaults.

Having affirmed the Fourth Amendment violation—the unlawfulness of Keith Crews' arrest—we must inquire whether the trial court erred in concluding that the courtroom identification was not the result of official "exploitation" of the "primary

10. See, e. g., Stone v. Powell, supra, 428 U.S. at 496, 96 S.Ct. 3037 (Burger, C. J., concurring); Brewer v. Williams, 430 U.S. 387, 416, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting).

11. The dual purpose underlying the exclusionary rule was explained by the Court in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960):

The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it. [Id. at 217, 80 S.Ct. at 1444.]

. . . . .

[T]here is [also] another consideration—the imperative of judicial integrity. [Id. at 222, 80 S.Ct. at 1447.]

12. We have encountered some difficulty in resolving this case because of the absence of any specific written or oral findings and conclusions by the trial court. Although the impediment in this case has not been too serious, we are concerned for the future. We therefore take this opportunity to urge the trial courts to make clear their particular factual findings and legal conclusions at suppression hearings. As will become clearer later in this opinion, exclusionary determinations hinge upon the interaction of myriad factors, and proper application of the analytical criteria depends upon awareness of the precise circumstances. Our appellate task when suppression of evidence is at issue demands an intelligible, complete record.

13. At this juncture it is sufficient to determine that probable cause was lacking. The exact nature—that is, the egregiousness or innocence—of the constitutional transgression, will be treated later. See Part III.E.3., infra.

illegality" within the meaning of *Wong Sun.*

### C. *Causation and the "Independent Source" Exception*

The initial question in assessing the asserted "exploitation" is whether the unlawful police behavior had a causal relationship to obtainment of the contested identification testimony.[14] Obviously, this evidence cannot be the product of exploitation if an official violation did not actually lead to or "cause" its acquisition. (Or, as expressed in *Wong Sun,* the evidence must have been "come at by" the exploitation. 371 U.S. at 488, 83 S.Ct. 407.) If, in the words of *Silverthorne, supra,* the courtroom identification arose instead from an "independent source," it cannot be tainted.[15]

The causal chain posited by appellant runs as follows: the unlawful arrest produced photographs which were shown to the complaining witnesses who, as a result, identified appellant; this resulted in his reapprehension, which yielded a court-ordered lineup identification and, eventually, in-court identification testimony during prosecution of the case. Thus, appellant says, the courtroom identification testimony was "actually discovered by" (*i. e.,* made available to the government through) "a process initiated by the unlawful act." *United States v. Paroutian,* 299 F.2d 486, 489 (2d Cir. 1962).

■■■■ Once a defendant makes a sufficient prima facie showing of illegality and a causal connection to the alleged fruit, the burden of producing evidence that will bring the case within one or more exceptions to the exclusionary rule rests squarely upon the prosecution. *See Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Note, *The Inevitability Exception to the Constitutional Exclusionary Rules,* 74 Colum.L.Rev. 88, 90 n.21 (1974) (hereafter "Colum."). Appellant

Crews clearly demonstrated a causal connection between the unlawful arrest and the in-court identification in this case. The onus thus shifted to the government.

Endeavoring to satisfy the independent-source exception, the government relies upon the victim's memory and abilities. She could identify him, the government argues, without regard to how he came to be in court or to the pretrial identification procedures in which she had participated. This argument is unsound, for it confuses "independent source" doctrine under the Fourth Amendment with due process analysis under the Fifth Amendment.

■■■■ When an in-court identification is contested under the Fifth Amendment on the basis of a "suggestive" pretrial identification procedure, the concern is the "reliability" of the identification. *See Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno, supra. See also Patterson v. United States,* D.C.App., 384 A.2d 663 (1978). Thus, the Fifth Amendment question is whether, under the "totality of the circumstances," the witness' identification is reliable enough, based on a previous, independent observation of the defendant, to withstand challenge on the ground that the pretrial procedure must have distorted the witness' perceptions. *See Manson, supra; Neil, supra.* When the courts find such reliability, they often characterize the identification as having an "independent source," *i. e.,* independent of the suggestive pretrial procedure. *See Clemons v. United States,* 133 U.S.App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). It is this kind of reliability analysis that the government apparently advances here.

---

**14.** For a general discussion of causation, *see* Maguire, *How to Unpoison the Fruit—the Fourth Amendment and the Exclusionary Rule,* 55 J.Crim.L.C. & P.S. 307, 310 *et seq.* (1964) (hereafter "Maguire").

**15.** For a discussion of how "independent source" analysis under the Fourth Amendment differs from such analysis under the Fifth Amendment, see text at note 16, *infra.*

The Fourth Amendment concern, however, is not reliability of evidence; it is deterrence of illegal searches and seizures by exclusion of unlawfully obtained evidence. Thus, the Fourth Amendment has an altogether different type of "independent source" exception. By definition, all evidence that is the product of—*i. e.*, has been "come at by exploitation of"—the official misconduct has no "independent source"; it is dependent on, and thus derived from, the violation of Fourth Amendment rights itself. Thus, it must be excluded *no matter how reliable. Wong Sun v. United States, supra.*[16] In summary, with regard to independent-source inquiry (but without regard to other possible exceptions to the exclusionary rule), the Fourth Amendment requires exclusion of all evidence, including identification testimony, that is directly traceable to—is causally related to—unlawful official behavior.

There is another perspective that helps make the constitutional distinctions clear. A Fifth Amendment violation will never occur unless unreliable evidence is introduced at trial. Thus, a defendant's due process rights will be protected if a witness' ability to identify is shown to be reliable irrespective of any suggestiveness at a pretrial identification; the pretrial taint will never cause a Fifth Amendment violation. A Fourth Amendment transgression, however, becomes an accomplished fact at the time of the illegal search or seizure. Thus, the exclusionary rule cannot prevent or adequately redress the present violation of Keith Crews' rights—nor is its purpose to do so. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Its goal, rather, is to deter future constitutional transgressions. *Id.* Unless the court excludes identification testimony that is obtained by unlawful arrest and confrontation with the witness, this "fruit" of the illegality will surface at trial; and the Fourth Amendment's deterrent purpose will be frustrated. Because the strength of a witness's independent ability to identify has no bearing on the means of obtaining evidence, it is irrelevant to the Fourth Amendment exclusionary purpose.

It follows, therefore, that the "independent source" exception under the Fourth Amendment, when identification evidence is an issue, cannot be satisfied by reference to a witness' independent capacity to identify; that is the wrong question. The Fourth Amendment exception is limited to an identification that has been *acquired wholly apart from* the illegal seizure. Such an independent source might include, for example, an identification of the accused by the same witness after a lawful arrest on another charge, or an identification by the same witness to a different team of detectives who had included a law-

---

16. As applied to identification evidence, this Fourth Amendment concern about deterrence—and the exclusionary rule response—are akin to the Sixth Amendment policy barring admission of a pretrial identification when an accused's right to counsel at that critical stage of the proceeding has been violated. *See Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). In a Sixth Amendment case, however, although the initial identification (absent counsel) is suppressed, a later in-court identification will be permitted if the witness' ability to identify is based on an unquestionably reliable "source" or "origin" independent of the pretrial identification (which was presumed to be suggestive in the absence of defense counsel). *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Application of the Sixth Amendment exclusionary rule, therefore, involves a dual purpose—reliability and deterrence—neither of which is necessarily offended by admission of an identification subsequent to the one when counsel was absent. The concern about reliability is met by the same type of independent source test employed in Fifth Amendment analysis. *Compare Wade, supra,* and *Manson, supra.* And deterrence of Sixth Amendment violations by the conduct of initial identifications without defense counsel present is deemed satisfied by the initial suppression, since acquisition of later identification evidence has no significant causal relation to the initial absence of counsel.

In our Fourth Amendment situation, however, the in-court identification remains causally related to the unlawful arrest, for that arrest led directly to production of the courtroom evidence. Thus, absent suppression, the deterrent purpose of the exclusionary rule would be frustrated (unless the attenuation exception is applicable). *See Part III.E., infra.*

fully obtained picture of the accused in a standard photographic array. For Fourth Amendment purposes, however, there can be no "independent" source for an identification that "stems from" the very illegality at issue. *See United States v. Paroutian, supra* at 489.

 In this case, the government proffers no independent source of the disputed identification evidence unrelated to appellant Crews' illegal apprehension; it therefore has not carried the burden of showing that the challenged evidence was "in no way connected with the unlawful arrest." *Bynum v. United States,* 107 U.S.App.D.C. 109, 274 F.2d 767 (1960). We conclude that the contested identification cannot be excepted from suppression under the *Wong Sun-Silverthorne* "independent source" test.[17]

An affirmative answer to the causation question, however, by no means ends the discussion about exploitation of the illegality. The government has suggested other exceptions to the exclusionary rule—to which we now turn.

B. *The "Inevitable Discovery" or "Hypothetical Independent Source" Doctrine*

 The so-called "inevitable discovery" exception to the exclusionary rule permits the government to "unpoison fruits" of official illegality by demonstrating that the evidence acquired by such exploitation also would inevitably have been obtained by legal means.[18] The origin of this principle can be traced to the Supreme Court's independent source doctrine promulgated in *Silverthorne* ;[19] but its introduction of supposition into the analysis—its reliance on a hypothetical independent source—is a substantial departure from the actual, independent-causation rationale which underlies that doctrine. Despite the recognition by two Justices that "[i]t is a significant constitutional question whether the 'independent source' exception to inadmissibility of fruits, *Wong Sun, supra* [371 U.S.], at 487–88 [83 S.Ct. 407], encompasses a hypothetical as well as an actual independent source," *Fitzpatrick v. New York,* 414 U.S. 1050, 94 S.Ct. 554, 555, 38 L.Ed.2d 338 (1973) (White, J. & Douglas, J., dissenting from denial of certiorari), the Supreme Court has declined the invitation to pass upon the validity of such an exception. *See United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 1058, 55 L.Ed.2d 268 (1978); *United States v. Castellana,* 488 F.2d 65, 68 (5th Cir.), *modified en banc,* 500 F.2d 325 (1974).[20] We are therefore left to examine the varied opinions of the lower courts, in light of the purposes of the exclusionary rule, in deciding whether to adopt the "in-

---

17. Mr. Justice Powell acknowledged the threshold nature of an actual causation determination when he concluded:

> [C]ompeting considerations [become] involved in a determination to exclude evidence *after finding* that official possession of that evidence was to some degree *caused by* a violation of the Fourth Amendment. [*Brown v. Illinois, supra,* 422 U.S. at 607, 95 S.Ct. at 2263 (Powell, J., concurring in part; emphasis added).]

Thus, it is the *existence* of a causal chain—of "some degree" of actual causation—that is tested by an independent source assault. The *strength* of the causal chain—the question whether the illegality is of sufficient force to require exclusion of resulting evidence—is the focus of "attenuation" analysis. *See* Part III.E., *infra.* When viewed in this light, it is evident that for exclusionary rule purposes the in-court identification of Mr. Crews was actually caused by—it was the product of—the Fourth Amendment wrong.

18. *See* Note, *Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule,* 5 Hofstra L.Rev. 137 (1976) [hereafter "Hofstra Note"]; Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Colum.L.Rev. 88 (1974) [hereafter "Colum."]; Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized,* 56 Cal.L.Rev. 579, 627–30 (1968) [hereafter "Pitler"]; Maguire, *supra.*

19. The inevitable discovery doctrine has been denominated "[t]he major attempt to flesh out the 'independent source' standard . . . ." Colum., *supra* at 90.

20. The Seventh Circuit's contrary conclusion in *United States ex rel. Owens v. Twomey,* 508 F.2d 858, 865 (7th Cir. 1974) betrays a strained, untenable reading of *Wong Sun* and its progeny.

evitable discovery" exception and, if so, whether to apply it to the circumstances here.

The inevitability asserted by the government in this case—a hypothetical chain of events between the police officers' initial sighting of Keith Crews at the Monument and his eventual identification by the victims—is premised on an argument that discovery of the contested evidence would have resulted from the diligent pursuit of "routine police investigatory procedures." See Colum., *supra* at 91. The government claims, in other words, that the in-court identification is admissible simply because the police would have identified and photographed Mr. Crews anyway, as a routine matter, as a result of evidence legally obtained during the stop, prior to arrest.

Individual courts have revealed significant internal divisions over the propriety of relying on such inevitable discovery. *See People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 300 N.E.2d 139, *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972). Legal commentary has both condemned inevitability doctrine. (Pitler, *supra*) and condoned it. Note, *Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule*, 5 Hofstra L.Rev. 137 (1976) (hereafter "Hofstra Note"); Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim. L.C. & P.S. 307 (1964) (hereafter "Maguire"). We find the Second Circuit's analysis of the issue to be the most enlightened. In *United States v. Paroutian, supra*, government agents twice executed unsuccessful, warrantless searches of appellant's apartment in the absence of exigent or exceptional circumstances. Eventually, during a third—this time lawful—entry and

search, the investigators found a secret compartment containing heroin. The circuit court of appeals reversed the trial judge's denial of suppression of the heroin, for the government had not refuted the prima facie showing of a causal link between knowledge acquired during the two illegal searches and the discovery of the evidence. Noting that evidence actually derived from independent legal leads—from an "independent source," *id.* at 489—was admissible, the court declined to extend the independent source rule into the realm of the "possible."

> [A] showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the question evidence without an illegal search cannot excuse the illegality or cure tainted matter. Such a rule would relax the protection of the right of privacy in the very cases in which, by the government's own admission, there is no reason for an unlawful search. The better the government's case against an individual, the freer it would be to invade his privacy. We cannot accept such a result. The test must be one of actualities, not possibilities. [*Id.* at 489.]

The court, refusing to conjecture about what might have been, acknowledged that while the government might have found the evidence in a wholly legal fashion, "that is not what happened." *Id.*

We find *Paroutian, supra*, persuasive and reject the reasoning of cases involving similar factual patterns, such as *People v. Fitzpatrick, supra*, and *Commonwealth v. Garvin, supra*, which, in our judgment, find inevitable discovery too convenient a tool to chip away at Fourth Amendment guarantees.[21] After thoroughly examining the

---

**21.** For other cases which have espoused inevitable discovery principles to varying extents in a host of different circumstances, *see United States ex rel. Owens v. Twomey, supra; Government of the Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Falley*, 489 F.2d 33 (2d Cir. 1973); *United States v. Seohnlein*, 423 F.2d 1051 (4th Cir.), *cert. denied*, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Killough v. United States,* 119 U.S.App.D.C. 10, 336 F.2d 929 (1964); *Wayne v. United States*, 115 U.S. App.D.C. 234, 318 F.2d 205, *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *United States ex rel. Roberts v. Ternullo*, 407 F.Supp. 1172 (E.D.N.Y.1976).

case law and canvassing the pertinent legal literature, we have concluded that there are at least two substantial reasons militating against adoption in this jurisdiction of an inevitable-discovery exception based on speculation about routine police investigatory procedures.[22]

First, the exception negates the deterrent purpose of the exclusionary rule. The deterrent effect of the suppression sanction is premised on the belief that the negative consequence (i. e., suppression of evidence) flowing from official misbehavior will help correct the future behavior of the particular offending official as well as others involved in law enforcement. As a result, transgressions of the Fourth Amendment will be minimized. To the contrary, however, a hypothetical independent source, premised on "inevitable discovery," relieves the pressure to act constitutionally; it sanctions end runs and shortcuts; it severely weakens and arguably removes the intended exclusionary deterrent. It would allow the police illegally to arrest, detain, and

photograph Keith Crews for an hour instead of following constitutional investigatory procedures that may—or may not— have yielded his correct identity, his photograph, and his positive identification by the victims. Indeed, such an approach would encourage officials to pursue an unlawful course, confident that after-the-fact recognition of the availability of a constitutional alternative would shield their wrongs.

Commentators have recognized the essential inconsistency between the inevitability doctrine and the exclusionary rule.

> Judicial sanctioning of [the doctrine] can only encourage police shortcuts whenever evidence may be more readily obtained by illegal than by legal means. This, of course, is the opposite of the purpose of the exclusionary rule: to deter law enforcement officers from using illegal methods to procure evidence. Although the efficiency and effects of the exclusionary rule have come under increasing attack, as long as it is the accepted means

For opinions which have repudiated the doctrine, see United States v. Castellana, 488 F.2d 65 (5th Cir.), modified en banc, 500 F.2d 325 (1974); United States v. Falley, supra at 42 (Oakes, J., concurring and dissenting); United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), aff'd, 414 F.2d 1262 (2d Cir. 1969); Killough v. United States, 114 U.S.App.D.C. 305, 312, 315 F.2d 241, 248 (1962) (Wright, J., concurring); Bynum v. United States, 104 U.S. App.D.C. 368, 262 F.2d 465 (1958).

22. In addition to the inevitability of discovery premised on routine investigatory procedures, courts and commentators have accepted and rejected potential inevitability resulting from: imminent or ongoing investigations—saturation and otherwise, Government of the Virgin Islands v. Gereau, supra; United States v. Falley, supra; United States v. Castellana, supra; United States ex rel. Roberts v. Ternullo, supra. See also United States v. Griffin, 502 F.2d 959 (6th Cir.), cert. denied, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); and "operation of law," Wayne v. United States, supra (coroner's required autopsy of dead body). See also Hofstra Note, supra at 156 et seq.; Colum., supra at 91 et seq. There are other cases which have addressed inevitability concepts but defy rigid categorization. See, e. g., Warren v. Territory of Hawaii, 119 F.2d 936 (9th Cir. 1941). The rationales for rejecting inevitable discovery doctrine in the present case are equally applicable in these other situations, for the doctrine

is exceedingly difficult to apply and is counterproductive from the deterrent standpoint.

There are at least two other recurring situations in the case law which may or may not actually implicate inevitable discovery principles and which are often mixtures of independent source, inevitability, and attenuation doctrines. First, there is the case of "dual actual causation"—i. e., both legal and illegal sources are "contributing causes" (Maguire, supra at 311) to the chain which ultimately produces contestable evidence. One court has metaphorically termed this situation the case "of a tree nourished by both pure and polluted waters." United States v. Schipani, supra. See James v. United States, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969). The other type of case often associated with inevitable discovery doctrine involves the very initiation of an investigation on the basis of illegal leads, with the eventual uncovering of evidence. See United States v. Cole, 463 F.2d 163 (2d Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972); United States v. Friedland, supra.

Since ours would be a case of inevitable discovery allegedly resulting from "routine investigative procedures," we need not, and do not, confront the "dual origin" or "illegal initiation" issues. We have noted these concepts and representative cases to illustrate the difficulties encountered when the judiciary attempts to speculate on the matter of actual causation.

of deterring official misconduct, judicial rules should be formulated to effectuate its intent. And the subverting effect that rules such as the inevitable discovery exception have on the exclusionary rule should be avoided. [Colum., *supra* at 99–100 (footnotes omitted).]

*See* Hofstra Note, *supra* at 156 *et seq.*; Pitler, *supra* at 630; *but see* Maguire, *supra* at 317. Moreover, there is no lack of judicial opposition to the encroachment. The Fifth Circuit, for example, refused

> the government's invitation to embrace [inevitable discovery because] . . . to admit unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway would be to cripple the exclusionary rule as a deterrent to improper police conduct. [*United States v. Castellana, supra* at 68.][23]

**23.** *See also United States v. Falley, supra* at 42–43 (Oakes, J., concurring and dissenting); *People v. Fitzpatrick, supra,* 32 N.Y.2d at 513, 346 N.Y.S.2d at 803, 300 N.E.2d at 146 (Wachtler, J., concurring); *Wayne v. United States, supra,* 115 U.S.App.D.C. at 244, 318 F.2d at 214 (Edgerton, J., dissenting).

**24.** *The dangerous, shortcut analysis permitted* by inevitable discovery doctrine is exemplified by *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972). The Pennsylvania Supreme Court, alluding to and relying in part on the inevitability of the defendant's eventual prosecution, refused to suppress a victim's in-court identification. The police had illegally arrested *a robbery-burglary suspect on an informant's* tip which did not satisfy the probable cause standards of *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and had taken him immediately to the scene of the crime and presented him to a victim, who identified him. Later both that victim and another positively identified the defendant at trial. The reasoning of the Pennsylvania court is not clear; it reflects the difficulties posed by the analytical mixture of exclusionary rule exceptions. After raising the possibility of attenuation resulting in a dissipated taint, the court begged the question by merely concluding that there was no reason to "employ the [exclusionary] sanction" when "the testimonial evidence did not derive from 'exploitation' of any illegality . . . ." *Garvin, supra,* 448 Pa. at 265–66, 293 A.2d at 37. The court implied that as long as the courtroom accusations of the witnesses were

In summary, the fundamental deterrent purpose of the exclusionary sanction, as developed in *Weeks, Silverthorne, Nardone, Wong Sun,* and even in the recent case law limiting the rule, cannot accommodate an inevitable-discovery exception.

█ The second reason for rejecting inevitable-discovery doctrine is the ambiguity, subjectivity, and consequent potential for abuse inherent in its application. It is too difficult—too speculative—to apply with confidence that the Fourth Amendment is not being compromised.[24]

> [A]llowing "poisoned" evidence in on the ground that some hypothetical police search would have uncovered the evidence anyway results in a speculative theory with no discernable limits.

. . . . .

> The "inevitable discovery" doctrine is . . . ambiguous and . . . sub-

accurate and based on independent knowledge, they could not be Fourth Amendment fruits. According to the majority:

> The illegal arrest in this instance merely provided the means for the confrontation with [the victim] more promptly than would otherwise have been the case. . . . We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely. [*Id.* 448 Pa. at 266, 293 A.2d at 37–38 (footnote omitted).]

Although the court did not specifically address inevitable discovery doctrine and relied upon a combination of mingled rationales, the implication of the final quoted sentence is clear: the identification eventually would have been performed absent the illegality. As Justice Manderino concluded in dissent, the majority abandoned accepted Fourth Amendment analysis in favor of "speculation . . . that the 'illegally seized person' would not have remained at large indefinitely and the illegal arrest merely hastened the inevitable confrontation." *Id.* at 271, 293 A.2d at 40.

Even if the inevitable discovery exception were valid, the *Garvin* majority misapplied it. Its refusal to "assume that but for the illegal arrest the appellant would have remained at large indefinitely," *id.* at 266, 293 A.2d at 38, improperly put the burden on defendant to show that he would have remained free absent *the illegal identification. It is widely recognized that the burden of "untainting" evidence by reference to any exclusionary rule exception is upon the government. *See* Part III.C., *supra,* and note 29, *infra.*

ject to abuse . . .. [*People v. Fitzpatrick, supra* 32 N.Y.2d at 513–15, 346 N.Y.S.2d at 803–04, 300 N.E.2d at 146–47 (Wachtler, J., concurring).]

We perceive a serious potential for abuse not only by individuals whose task is to discover and prevent crime but also by prosecutors, whose " 'sophisticated argument' aided by hindsight [could] be used to show what the police would have done in a given situation." Hofstra Note, *supra* at 155. We decline to expose the safeguard of the Fourth Amendment to an "inevitable discovery" exception that undermines the Fourth Amendment exclusionary deterrent by reliance on conjecture. As the District of Columbia Circuit Court once admonished:

> The important thing is that those administering the criminal law understand that they *must* do it [the legal] way. [*Bynum v. United States,* 104 U.S.App.D.C. 368, 372, 262 F.2d 465, 469 (1958) (emphasis added).] [25]

■ It is important to stress, finally, that even if we were persuaded not to reject the doctrine of inevitable discovery altogether it could not properly be applied to the present setting. As noted earlier, by the terms of the accepted formulation of inevitability doctrine, the prosecution has the burden to show that the evidence would most certainly have been obtained by lawful means.[26] In the special breed of cases in which the government contends that "routine investigative procedures" would lead to "inevitable discovery," the government must show that the procedure "is clearly

routine and its results readily predictable." Colum., *supra* at 93.

> The prosecution must prove both that the procedure would have been used and that it would have actually turned up the questioned evidence. The prosecution does not satisfy this burden by mere speculation that such procedures would have been used and such results obtained. [*Id.* (footnotes omitted).]

The government has not persuaded us that based on an awareness of appellant's name, age, and description (the data which we assume was properly acquired; *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) it definitely would have been able to obtain an initial photograph and an ultimate in-court identification. We are requested to speculate that the appellant's name, age, and description would, without doubt, have enabled the authorities to find appellant and photograph him (or obtain a recent photograph); that the witnesses would have continued to have the ability to identify appellant at the end of whatever time period it would have taken to obtain such a photograph; and that the officers actually would have pursued all the leads necessary. We decline. "Likelihood, even great likelihood, is not, of course, inevitability." Colum., *supra* at 98. We cannot conclude with certainty that the evidence challenged here would have been inevitably discovered. Even were we not to reject the inevitability doctrine as a general proposition, we could not approve its invocation here.[27]

25. The District of Columbia Circuit's position on inevitability doctrine is not clear. *Bynum, supra,* would appear to repudiate the doctrine. However, in *Wayne v. United States, supra,* and *Killough v. United States,* 119 U.S.App. D.C. 10, 336 F.2d 929 (1964), both of which involved attempts to suppress illegally discovered bodies of murder victims, split divisions of the circuit court endorsed the doctrine. Because of their unique facts, and the additional fact that *Wayne's* inevitability resulted from "operation of law," we find these cases to be of limited precedential value, and certainly not indicative of the circuit's general acceptance of the theory. In any event, even if the D.C. Circuit had accepted the doctrine outright prior to 197₁, this court, sitting en banc, is empow-

ered to disagree. *M. A. P. v. Ryan,* D.C.App., 285 A.2d 310, 312 (1971).

26. *Maguire, supra* at 317: "It must satisfy the court, as a fact, that the proffered evidence *would* have been acquired through lawful sources of information even if the illegal act had never taken place."

27. At least one author urges the limited acceptance of inevitable discovery principles and their application in light of "the policies underlying the exclusionary rule." Hofstra Note, *supra* at 162. He would take into account variables such as the "good faith" of the officers. Because we find the theory of inevitable discovery inconsistent with the exclusionary rule,

### E. *Attenuation Doctrine*

Finally, our resolution of the question whether the courtroom identification of appellant Crews was obtained by "exploitation" of the "primary illegality" must deal with the most prominent of the exceptions to the exclusionary rule: attenuation. The government contends that the circumstances necessitate a holding that the taint of the illegal arrest had been adequately purged by the time the in-court identification took place. Appellant urges that this taint did not dissipate; it carried through to the courtroom identification.

As noted earlier, the attenuation principle, announced in *Nardone v. United States, supra,* was significantly developed by Justice Brennan's elaboration in *Wong Sun, supra.* Recently, in *Brown v. Illinois, supra,* the Supreme Court discussed even more thoroughly the dimensions, details, and proper application of "attenuation." There, the Court held that the inculpatory statements of a defendant arrested without probable cause or a warrant should be suppressed, even though preceded by *Miranda* warnings, since these warnings themselves did not provide sufficient attenuation to "purge the taint of an illegal arrest." *Brown, supra,* 422 U.S. at 605, 95 S.Ct. at 2263.

In the majority opinion, Justice Blackmun indicated that the key words in the *Wong Sun* formulation are found in the question whether the evidence has been developed "by means *sufficiently distinguishable* to be purged of the primary taint." *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417 (emphasis added). He stressed that this question of attenuation must be answered in each case consistent with the "considerations of deterrence and of judicial integrity" which undergird the exclusionary rule. *Brown, supra,* 422 U.S. at 599, 95 S.Ct. at 2259. *See Elkins v. United States,*

quoted at note 11, *supra.* He then delineated and approved the pertinent variables developed by the lower courts in applying the purge principles of *Nardone* and *Wong Sun* to the secondary (derivative) fruits of Fourth Amendment illegality:

(1) "[T]emporal proximity"; *i. e.,* the amount of time between the illegality and the obtainment of the disputed evidence;

(2) "[I]ntervening circumstances";

(3) "[A]nd, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2262.

■ The *Brown* opinion thus injected precision into the process of assessing attenuation. *See id.* at 606, 95 S.Ct. 2254 (Powell, J., concurring). Too often courts had set out the facts of a case and merely concluded that on the whole attenuation appeared—*i. e.,* the fruit had been unpoisoned—without a reasoned analysis of pertinent considerations. *See, e. g., Lockridge v. Superior Court,* 3 Cal.3d 166, 174, 89 Cal.Rptr. 731, 736–37, 474 P.2d 683, 688 (1970), *cert. denied,* 402 U.S. 910, 91 S.Ct. 1387, 28 L.Ed.2d 652 (1971). Now, in light of *Brown,* it is clear that such conclusory decisions must be avoided in favor of concrete application of these three principal variables.[28]

#### 1. *Temporal Proximity*

Time is to be factored into attenuation determinations. The *Brown* opinion adopts the view that the length of the time between the illegality and the obtaining of evidence has a direct bearing on whether exclusion of that evidence will deter future misconduct. The Supreme Court accepts the proposition that the potential impact of the exclusionary rule on law enforcement agents' behavior diminishes as the connection between the misconduct and the evidence is protracted over time. In other

but also because we find the policy factors more appropriately discussed in the context of "attenuation," *see Brown v. Illinois, supra,* and not "causation," we reject this approach.

**28.** At the outset of this discussion, it is important to note that the attenuation exception,

unlike the independent source exception, applies only to secondary, *i. e.,* derivative, fruits, such as the identification testimony here at issue, and not to the initial, immediate products of an illegal search or seizure. A chain of one link cannot be attenuated.

words, the prospect of exclusion far in the future does not provide as much disincentive for misdeeds in the present. *See United States v. Ceccolini, supra* at 1062.

 In our case the government points to the time span between the January 9, 1974, arrest of Mr. Crews and the April 23, 1974, in-court identification as a basis for sufficient attenuation to avoid exclusion of the evidence. While this expanse may have some dissipating significance, it is obviously quite a brief period in the context of the criminal justice process. Moreover, there are two other reasons why this January-April time interval does not contribute very much to carrying the government's burden to demonstrate the purge.[29]

 First, while the initial arrest and the taking of the photograph did occur on January 9, 1974, the illegality in this case did not end on that date. The eventual rearrest and confinement of Mr. Crews and his ultimate appearance at trial were all based on tainted facts (the government demonstrated no independent basis for re-arrest). Thus, the entire course of events was accomplished in violation of the Fourth Amendment. *See* Part III.B., *supra.* Since apparently there was no independent probable cause for official detention and the wrong thus continued, the time between initial arrest and ultimate procurement of evidence must be substantially discounted. *See United States ex rel. Gockley v. Myers,* 450 F.2d 232, 238 (3d Cir. 1971), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 738, 30 L.Ed.2d 752 (1972).

 Second, time is usually the least influential element of attenuation analysis. A contrary conclusion would place a substantial premium upon investigative and prosecutorial delay with an eye to dissipation. As will appear from the following sections, the presence or absence of significant intervening events and the character of the offending official behavior are more

crucial determinants in the equation. The effect of a time lapse of any duration must be considered in light of the other two factors; otherwise, the deterrent rationale may be disserved.

### 2. Intervening Events

The prosecution points to a number of occurrences between the police impropriety and the production of the contested identification which allegedly dissipated the taint: (1) appellant's January 16, 1974, appearance in court and the resulting court-ordered lineup; (2) the February 22, 1974, grand jury indictment; (3) appellant's March 8, 1974, arraignment; and (4) his two pretrial status hearing appearances on March 26 and April 5, 1974. We cannot conclude that any of these events was an effective attenuator. Nor were all taken together.

 While there are no clear criteria against which to assess such interim occurrences, it is evident that to purge the taint the government must establish a *"significant* intervening event [which] *altered* the relationship established between petitioner and the officers by the illegal arrest." *Brown, supra,* 422 U.S. at 608, 95 S.Ct. at 2264 (Powell, J., concurring in part; emphasis added). The intervention of an event—even several "official" events as occurred here—will not be "significant" unless the tainted chain is severed. The event must be of a nature that forecloses the possibility of substantial deterrence from suppression; thus, it must preclude both the appearance and reality of gain from misconduct.[30] Only if there is a broken connection between the violation and the ultimate evidentiary profit can it be assumed that exclusion would not foster deterrence—that admission of the evidence would not encourage illegality.

 *Wong Sun* itself involved the most frequently effective intervening event: an

---

29. It is vital to bear in mind that the government bears the burden of proof of attenuation of the taint, *Brown, supra,* 422 U.S. at 605, 95 S.Ct. 2254, as it does for all exceptions to exclusion. *See* Part III.C., *supra.*

30. This aspect of attenuation is analogous to independent source doctrine. *See* Part III.C., *supra.*

act of free will by an individual in giving a statement or other evidence to officials.

On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, [the Court held] that the connection between the arrest and the statement had "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307. [*Wong Sun, supra,* 371 U.S. at 491, 83 S.Ct. at 419.]

The basis for finding a defendant's untainted exercise of free will—*i. e.,* the voluntary choice to furnish evidence—to be a significant intervening event consonant with the deterrence policy was explicated by Justice Powell in *Brown v. Illinois, supra,* 422 U.S. at 610, 95 S.Ct. at 2265:

If an illegal arrest merely provides the occasion of initial contact between the police and the accused, and because of time or other intervening factors the accused's eventual statement is the product of his own reflection and free will, application of the exclusionary rule can serve little purpose: *the police normally will not make an illegal arrest in the hope of eventually obtaining such a truly volunteered statement.* [Emphasis added.]

*See also United States v. Scotten,* 428 F.Supp. 256 (D.Nev.1976), *appeal dismissed,* 556 F.2d 590 (9th Cir. 1977). Thus, we conclude that an intervening event will not be "significant" for attenuation purposes unless it alters the relationship between the police and the accused in a way that precludes the police from perceiving a reward for taking illegal advantage of the accused. *See* discussion of *United States v. Ceccolini, supra,* in note 37, *infra.*

 None of the attenuating events proffered by the government can serve to purge the taint in this case. Appellant's January 16 court appearance with the consequent court-ordered lineup, as well as his February 22 indictment, have superficial appeal in the sense that independent governmental authorities interposed their judgment that there was a basis for detaining and trying Mr. Crews. The fallacy of reliance upon the court's and the grand jury's decisions, however, lies in the obvious factual underpinning of those determinations: the tainted identifications made by the witnesses at the photo array sessions. The government cannot untaint identifications by conducting its own intervening events which themselves are flavored with the very same source of impropriety. The impermissible bootstrap effect is obvious.

 The identical flaw also infects the arraignment and pretrial status hearings. In addition, even if these hearings were not so affected, it is not at all apparent that they would constitute independent legal determinations sufficient to fracture the deterrent chain. It is difficult to perceive how an arraignment or a simple status hearing could "significantly alter the relationship" originated by official illegality. In any event, the government has not carried its burden in this regard; and it is not within our province to speculate about significant intervention.[31]

Finally, we perceive a critical distinction between this case and the one chiefly relied upon by the government, *Johnson v. Louisiana, supra.* In *Johnson,* the accused, alleging that "his nighttime arrest without a warrant was unlawful," *id.* 406 U.S. at 365, 92 S.Ct. at 1626, challenged his subsequent identification at a lineup on Fourth Amendment grounds. The court, assuming invalidity of the arrest, held that the defendant's lineup identification could not be a poisoned fruit of that arrest because

---

31. If Mr. Crews had returned to official custody of his own volition, any evidence developed as a result would have been purged of the primary taint. Like Wong Sun, appellant would have severed the legal connection between official misbehavior and the evidentiary harvest, for, as Justice Powell noted in *Brown, supra,* 422 U.S. at 610, 95 S.Ct. 2254, the police are not presumed to anticipate "truly volunteered" evidence, and exclusion accordingly would "serve little purpose." The government, however, has pointed to no voluntary action by appellant in the chain of events here, and the "voluntary" identification by the witness cannot substitute. That identification most certainly was within the ambit of official anticipation. *See* the discussion of *United States v. Ceccolini, supra,* in Part III.E.3, *infra* and at note 37, *infra.*

[p]rior to the lineup . . . he had been brought before a committing magistrate to advise him of his rights and set bail. At the time of the lineup, the detention of the appellant was under the authority of this commitment. [*Id.*]

In *Johnson,* there could be no question of a taint attaching to a probable cause or other postarrest judicial determination, for prior to the arrest the government was lawfully aware that "the victim of an armed robbery had identified Johnson from photographs as having committed the crime." *Id.,* 406 U.S. at 358, 92 S.Ct. at 1623. Consequently, the defendant did not challenge the sufficiency of the factual predicate for arrest; instead he objected to the unexcused failure to obtain a warrant. This procedural failure, even if unconstitutional, could not have had a bearing on the magistrate's subsequent, independent determination of probable cause founded upon sufficient, untainted evidence possessed prior to the unlawful arrest. Because the magistrate's determination was not dependent upon information attributable to the unlawful arrest, that separate, neutral judicial event—which might have led to defendant's release absent reliable, prearrest identification evidence—"significantly altered the relationship" between the accused and the police. It broke any causal connection between the illegal arrest and the lineup identification.

As we have already noted, however, judicial intervention which itself is afflicted with the very infirmity it is supposed to prevent—*i. e.,* the taint of an arrest without probable cause—cannot serve the attenuating function of the independent magistrate's determination in *Johnson.* All the intervening events alleged by the government in this case were themselves tainted by Keith Crews' arrest. They could not supplant the illicit source; they could only reinforce it. Therefore, we hold that the courtroom identification of appellant was not purged of the taint by any significant intervening event. A contrary result, from the deterrent standpoint, would be counterproductive.

We turn now to the third and final variable in evaluating attenuation.

3. *The Nature and Character of the Fourth Amendment Violation*

The government argues that the actions of the police officers in arresting appellant, conveying him to headquarters, and then photographing him do not constitute a purposeful, let alone flagrant, Fourth Amendment violation. To the contrary, the government maintains that "an illegal arrest is the most that this record establishes." Because our reading of the relevant testimony does not square with this characterization, we cannot find a source of attenuation in the official conduct of this case.[32]

**32.** When this appeal was before a division of this court, and again as part of the briefing and oral argument before the en banc court, the parties focused heavily on appellant's claim that the arrest here was a "sham" or a "pretext"—a purported arrest for truancy to cover the intention to arrest and obtain evidence for armed robbery and assault. Particular attention was devoted to the extreme case of *Edmons v. United States, supra* (FBI "dragnet arrest" of several individuals for selective service violations when the true purpose was to obtain identifications of assailants of fellow agents). *See Amador-Gonzalez v. United States,* 391 F.2d 308 (5th Cir. 1968); *Taglavore v. United States,* 291 F.2d 262 (9th Cir. 1961); *McKnight v. United States,* 87 U.S.App.D.C. 151, 183 F.2d 977 (1950). Courts are uniform in condemning this practice under the Fourth Amendment and invoking the exclusionary rule. "An arrest may not be used as a pretext to search for evidence." *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). These cases can be said to comprise a "sham" or "pretext" arrest subspecies under the Fourth Amendment.

We do not believe it appropriate to classify this case under the sham-pretext line of authority. Although the officers who apprehended Mr. Crews may have had grounds for apprehending him as a potential truant, the fact is that they did not do so. The record does not reflect that appellant was informed he was being detained and transported to headquarters as a suspected truant. To the contrary, he was told that he matched a robber's description. Further, although the officers stated that appellant was "processed" as a truant, it does not appear that the procedures followed in Mr. Crews' case conformed to the typical truancy practices also described by the officers. While there is some ambiguity and contradiction, the thrust of the testimony reveals that the photograph was taken for display to robbery victims; and the school was called to determine whether

Although "no mathematical weight can be assigned to any of the factors" bearing on attenuation, *United States v. Ceccolini, supra* at 1062, the character of the official impropriety is the most germane of the attenuating variables and is clearly the dispositive one in the balance struck here.[33] The majority opinion in *Brown v. Illinois, supra,* held "particularly [relevant] the purpose and flagrancy of the official misconduct," *id.* at 604, 95 S.Ct. at 2262 and Justice Powell's partial concurrence announced that "the point at which the taint can be said to be dissipated should be related, in the absence of other controlling circumstances, *to the nature of the taint." Id.* at 609, 95 S.Ct. at 2265 (emphasis added).[34]

As with "temporal proximity" and "significant intervening events," the "nature of the conduct" attenuator has a sound foundation in the deterrent theory of the exclusionary rule, for the "basic purpose of the rule . . . *is to remove possible motivations for illegal arrest." Brown, supra* at 610, 95 S.Ct. at 2265 (Powell, J., concurring in part; emphasis added). It is presumed, and soundly so, that officials who have consciously chosen to tread upon Fourth Amendment protections are particularly aware of the connection between their conduct and the evidence produced. Thus, they will be especially susceptible to deterrence if deprived of the benefit of that evidence. As a consequence, when a Fourth Amendment violation has occurred, the government's burden to demonstrate attenuation is usually a heavy one; and the government's difficulty in doing so will increase in proportion to the offensiveness and purposiveness of the misconduct.

Both explicitly and implicitly, there is a widespread case law recognition of this point: the more flagrant the unconstitutionality, the less curable is the taint.[35] The majority opinion in *Brown v. Illinois, supra,* relied primarily on the fact that the

> illegality . . . had a quality of purposefulness. The impropriety of the arrest was obvious . . . .. The arrest, both in design and in execution, was *investigatory.* [*Id.* 422 U.S. at 605, 95 S.Ct. at 2262 (emphasis added).]

Similarly, in *United States v. Edmons, supra,* the court found that the arrests at issue "violated the Fourth Amendment . . . because law enforcement officers . . . *deliberately* seized the appellants . . . *for the purpose of* displaying them to the agents who had been present at

---

appellant was present on January 3 and 6, the dates of the robberies. It appears that the officers never even superficially pursued the truancy matter.

Accordingly, we believe that the official misconduct here—the arrest for armed robbery and assault without probable cause—is more suitably analyzed under traditional Fourth Amendment exclusionary rule criteria and thus, more particularly, as a factor bearing on attenuation. In summary, we do not order suppression of the evidence on the theory that the government engaged in a sham. Instead, we factor the degree of official misbehavior into the formula for determining whether the initial taint of illegality has dissipated.

33. Recall that this factor is pertinent only when attenuation is at stake—*i. e.,* when secondarily acquired, derivative evidence is challenged. *See* note 28, *supra. If the evidence is an immediate product of an unlawful search and seizure, that evidence is automatically excludable;* there is no room for a court to weigh admissibility based on the degree of misconduct. We join Justice Powell in concluding that suppression of immediately derived products, no matter what the nature of the source, is a "con-

straint . . . imposed by existing exclusionary-rule law." *Brown, supra,* 422 U.S. at 612, 95 S.Ct. at 2266.

34. The Second Circuit, in *United States v. Edmons, supra* at 584, pointedly acknowledged that the language chosen in *Wong Sun* strongly implies that the nature of the transgression plays a vital role in "fruit of the poisonous tree" assessments:

> It has been well said of the statement by Professor Maguire endorsed in *Wong Sun* that "the sense of purposiveness and self-seeking of the term 'exploitation' is striking, and serves as a reminder that the exclusionary rule is a deterrent device." Ruffin, Out on a Limb of the Poisonous Tree: The Tainted Witness, 15 U.C.L.A.L.Rev. 32, 38 (1967). See also Pitler, supra, 56 Calif.L.Rev. at 588–89.

35. Indeed, even critics of the scope of the exclusionary rule acknowledge its utility in cases of intentional official misconduct. *See Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

the scene of the crime." *Id.* at 583 (emphasis added). The court held that "in applying the exclusionary rule as a deterrent device, account should be taken of the degree of police misconduct." *Id.* at 585. Finally, the District of Columbia Circuit, in suppressing a confession and lineup identification testimony, leaned heavily upon the circumstance that "the manner in which [the defendant's case] was handled by the police clearly demonstrate[d] that it was one *for investigation*." *Gatlin v. United States, supra,* 117 U.S. App.D.C. at 128, 326 F.2d at 671 (1963) (emphasis added). The courts, therefore, have specifically condemned deliberate seizures for investigation.

The facts of this case bring it squarely under the authority of the controlling principles of these cases condemning the evidentiary fruits of investigatory arrests. One of the officers who initially detained appellant conceded that from the start the focus upon Keith Crews was initiated by suspicion of his involvement in the Washington Monument robberies. Indeed, the police told Mr. Crews straightaway, upon the initial stop that he matched the culprit's description. Detective Ore, who was in charge of the robbery investigation, admitted that he was summoned to the scene to view a robbery suspect; that Mr. Crews was taken to the station and photographed because he matched the robber's description; that the ongoing intent was to display such photographs to the victims; and that they called appellant's school to discover whether he had attended on the days of the two robberies. The scenario

which emerges from this testimony is unambiguous: appellant Crews was intentionally subjected to an investigatory arrest for the very purpose of obtaining identification evidence. *See* note 33, *supra.*

The remarkable parallels to the offending police activity in *Brown v. Illinois, supra,* are noteworthy. In that case, as in this,

> [t]he impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." . . . The detectives embarked upon this expedition for evidence in the hope that something might turn up. [*Id.,* 422 U.S. at 605, 95 S.Ct. at 2262 (footnote omitted).] [36]

Further, we agree with the authorities which have observed that the importance and necessity of suppressing evidence are substantially enhanced when the evidence unlawfully obtained is the specific goal the police set out to achieve:

> When the police, not knowing the perpetrator's identity make an arrest in deliberate violation of the Fourth Amendment for the very purpose of exhibiting a person before a victim and *with a view toward having any resulting identification duplicated at trial,* the fulfillment of this objective is . . . an exploitation of "the primary illegality" . . . . The government "exploits" an unlawful arrest when it obtains a conviction on the basis of the very evidence . . . which it hoped to obtain by its unconstitutional

**36.** The severe constitutional perils inherent in "investigatory" seizures of citizens already had been described by the Supreme Court in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969):

> Investigatory seizures would subject unlimited numbers of innocent persons to harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "investigatory detentions." [*Id.* at 726–27, 89 S.Ct. at 1397 (footnote omitted).]

It would not matter that the police did not engage in widespread arrests of all youths who fit the general description in this case. Actually, our inability to know whether or not there were others, or how many others were treated similarly to appellant, strengthens the argument for proscribing the known incident, for it is the unknown, innocent individuals whose rights can only be safeguarded by the deterrence achieved in cases such as this. *See Elkins v. United States, supra,* 364 U.S. at 217–18, 80 S.Ct. 1437.

act. [*Edmons, supra* at 584 (emphasis added).]

*See also United States v. Bacall,* 443 F.2d 1050 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971).

The present case, therefore, stands in marked contrast to the recent Supreme Court decision in *United States v. Ceccolini, supra,* relied upon by the dissenters. There, a uniformed police officer, taking a break from assisting at a school crossing, visited a friend at a flower shop where she was employed. He observed an envelope on the cash register with money sticking out of it. Upon opening it (apparently on impulse), he discovered policy slips. He asked his friend, the employee, to whom the envelope belonged, whereupon she gave the defendant's name. The officer reported the incident to detectives on the force who then informed the FBI. Four months later an FBI agent interviewed the employee. Over a year later defendant testified before a grand jury that he had never taken policy bets; thereafter, the flower shop employee testified to the contrary. Defendant was then indicted for perjury. At the perjury trial, the District Court suppressed the flower shop employee's testimony as the fruit of an illegal search of the envelope. The Second Circuit affirmed but the Supreme Court reversed on a finding of sufficient attenuation.

> The evidence indicates overwhelmingly that the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of [Officer] Biro's discovery of the policy slips. Nor were the slips themselves used in questioning [witness] Hennessey. Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other. While the particular knowledge to which Hennessey testified at trial can be logically tracked back to Biro's discovery of the policy slips, both the identity of Hennessey and her relationship with the respondent was [sic] well known to those investigating the case. There is, in addition, *not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less any suggestion that he entered the shop and searched with the intent of finding a willing and knowledgeable witness to testify against respondent. Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as Biro.* [*Id.* at 1062 (emphasis added).]

The court suggested that suppression of the evidence might have been warranted if "the search [had been] conducted by the police for the specific purpose of discovering potential witnesses," *id.* at 1060 n.4—a statement reaffirming the message of *Brown v. Illinois, supra,* that the evidentiary fruits of an unlawful investigatory arrest are not likely to survive suppression on the grounds of attenuation.[37]

---

**37.** *Ceccolini,* therefore, is distinguishable from the present case with reference to all three attenuation variables: (1) the official conduct was not flagrant; it did not reflect a purposeful search for evidence bearing on an illicit gambling operation; (2) the length of time between the officer's illegal search of the envelope and the witness' eventual testimony at trial was considerable; and (3) the witness' free will in *Ceccolini* (in contrast with the present case) was a significant intervening event.

More particularly, as to this last, "free will" variable, we note that in *Ceccolini* the witness was discovered as a result of the illegal search. Suppression of her testimony, however, would not have served the deterrent purpose of the exclusionary rule, for the policeman at the flower shop could not have perceived the eventual reward of that witness' testimony from his unlawful look inside the envelope. As the Court indicated in *Brown v. Illinois, supra,* 422 U.S. at 610, 95 S.Ct. at 2265, the rationale for recognizing a witness' free will as a significant attenuating variable is that "the police normally will not make an illegal arrest [or search] in the hope of eventually obtaining such a truly volunteered statement."

In *Ceccolini,* however, the Court "reject[ed] the Government's suggestion that we adopt what would in practice amount to a *per se* rule that the testimony of a live witness should not be excluded [from] trial . . . ." *Id.* at 1059. The present case is a clear example of why such a per se rule would compromise the

We believe that fidelity to the Constitution mandates our disapproval of the official misconduct which was designed to lead—and did lead—to the identification evidence in this case. We reject the notion that mere suppression of the photographic and lineup identification testimony, but not the in-court identification, would somehow be an adequate deterrent sanction in this case. This conclusion could only result from the untenable assumption that a sufficient disincentive results when the police are prohibited from enjoying some, but not all, of the products of their wrong.

> Once we restore *any* profit to the unlawful search or seizure . . . we furnish an incentive for law enforcement officials to engage in unconstitutional methods of law enforcement, and the danger of the use of such methods extends to the citizenry generally, including the innocent. In order for the exclusion-

ary rule to be effective in deterring unconstitutional searches and seizures, it is not enough to remove *some* of the profit of such searches and seizures; *all* of the profit must be removed, for law enforcement officials, faced with a situation which permits any gain from the unlawful conduct, however remote, are ·furnished an incentive to violate the constitutional guarantees. [*Lockridge v. Superior Court, supra* 3 Cal.3d at 173, 89 Cal. Rptr. at 736, 474 P.2d at 688 (Peters, J., dissenting; emphasis in original).] [38]

▮ In summary, we cannot find sufficient attenuation of serious taint created by the purposeful, unconstitutional conduct of the law enforcement agents in this case. There was neither an expanse of time, nor a significant intervening event, nor a sufficiently innocuous violation of rights adequate to exempt the government from application of the exclusionary rule.[39]

Fourth Amendment. Here, the witness could never have volunteered an identification of Keith Crews of her own free will, absent the unlawful arrest and photograph. Her in-court identification was premised on this critical link to Mr. Crews illegally acquired by the police. Thus, in the present case, the significant result of the unlawful police activity was not discovery of the witness (who was already known and ready to testify); it was the tangible evidence that made her initial identification, as well as her eventual in-court identification, possible. The police had every reason to anticipate that if they could obtain a photograph of the assailant, by any means, identification by a ready witness would quickly follow. Accordingly, the free will of the witness in the present case does not represent an attenuating, intervening force. To the contrary, unless the exclusionary rule is applied in this case, an important deterrent would be relaxed; an incentive would be created for illegal arrests and searches in the hope of finding tangible evidence to facilitate identifications by known witnesses.

**38.** We find critical distinctions between the cases cited in support of the government's argument for dissipation and the present case. In *Bond v. United States*, D.C.App., 310 A.2d 221 (1973), this court concluded there was no indication that a photograph obtained in an allegedly illegal arrest in another matter "caused the police to concentrate attention upon [appellant] when trying to find the culprit in this case." *Id.* at 225. Thus, any identification "fruit" utilized in the second case, *Bond*, was acquired "not [by] exploitation but [by]

happenstance." *Id.* Clearly, in *Bond* the time gap between original illegality and eventual "fruit," the lack of relationship between the crime involved in the illegal arrest and the crime leading to the later arrest, conviction and appeal, and the evident lack of design or purpose by officialdom were influential in the court's attenuation conclusion.

It is also clear that neither *Payne v. United States, supra* (analyzed and criticized in note 6, *supra*) nor *United States v. Reid*, 527 F.2d 380 (2d Cir. 1975) involved purposeful Fourth Amendment violations. *See id.* at 383 (court distinguished *Edmons* on this critical ground).

**39.** Early in our discussion of the Fourth Amendment's exclusionary rule, we adverted to its dual purpose: deterrence and judicial integrity. *See* Part III.A. and note 11, *supra*. We have, nevertheless, relied solely on the deterrence rationale in progressing through the variety of purported justifications for admission of the contested in-court identification of appellant Crews. Although we therefore follow the Supreme Court view that deterrence is the "primary justification for the exclusionary rule," *Stone v. Powell, supra*, 428 U.S. at 486, 96 S.Ct. at 3048, we wish to stress that the "imperative of judicial integrity," *Elkins v. United States, supra*, 364 U.S. at 222, 80 S.Ct. 1437, is an important factor in direct review of official constitutional violations. The more purposeful the official transgression, the greater is the reason for judicial refusal to sanction it. This is particularly true when—as in this case—the materialization of the evidence sought by the official misconduct is effected

## IV. CONCLUSION

Essentially, this is a case concerning an unconstitutional investigatory arrest. Such police action recently has been condemned by the Supreme Court. *See Brown v. Illinois, supra* 422 U.S. at 605, 95 S.Ct. 2254. It will not be tolerated in the District of Columbia.

*Reversed and remanded.*

NEBEKER, Associate Judge, dissenting with whom HARRIS, Associate Judge, joins:

This case was decided correctly and for the right reasons by Judge Harris' earlier majority opinion for the division. *Crews v. United States*, D.C.App., 369 A.2d 1063 (1977). Since then what was arguably the subject of disagreement has been resolved by the recent decision of the Supreme Court in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). It is earnestly to be hoped that the instant case will become the subject of further review where surely it may be disposed of on the authority of *Ceccolini* in the same manner used by the Court in deciding *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

Stripped of its labored and burdened analysis, the majority opinion holds that an illegal arrest bars the government from producing at trial a victim who readily and willingly can identify the accused from observation and memory of the criminal event. The perpetual disability is imposed in the face of the inescapable fact that "the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of" the illegal arrest. *Ceccolini, supra,*

through the medium of trial. We believe that courts must be chary of becoming accomplices in the invasion of an individual's privacy. In this era of heightened public sensitivity to ethics in governmental affairs, the judiciary must still "resolutely set its face" against the "pernicious doctrine" that "the government may commit crimes in order to secure the conviction of a private criminal." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (Brandeis, J., dissenting). *See also*

435 U.S. at 279, 98 S.Ct. at 1062. Contrary to the assertion of the majority, the official misconduct did not "lead . . . to the identification evidence in this case." At 303. That evidence existed from the moment of the robbery and came directly and independently to the trial. At most, it was the government's ability to have the accused present at trial which "stems from" (at 291) the illegal arrest. No prior authoritative decision has carried the exclusionary rule over such a precipice of unacceptability.

> [T]he remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book. [*United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966).]

Wisdom and the integrity of the judicial process cry out against this holding. Its cost to society, on balance, is too great. *See Ceccolini, supra,* 435 U.S. at 275 -278, 98 S.Ct. at 1060--61, citing *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), McCormick on Evidence § 71, at 150 (1954), and *Michigan v. Tucker*, 417 U.S. 433, 450–51, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). *See also Dickerson v. United States*, D.C.App., 296 A.2d 708 (1972) (Nebeker, J., concurring).

HARRIS, Associate Judge, dissenting:

I shall not enlarge upon the views set forth in the original (but now vacated) majority opinion which affirmed appellant's conviction. *Crews v. United States*, D.C. App., 369 A.2d 1063 (1977). I do, however,

*United States v. Toscanino, supra* at 274. ("Society is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law.")

We therefore rely secondarily upon the preservation of the integrity of our judicial system in ordering suppression of the courtroom identification of appellant. We accept judicial integrity as a still vital supplementary rationale whose cogency is closely related to that of deterrence in a given case.

assert my continued belief in their validity. I make but a few further observations.

A new student of the Fourth Amendment and the exclusionary rule which has been developed thereunder soon learns a number of truisms. Among them are: (1) there is an infinite variety of factual situations in search and seizure cases, with virtually no two ever being identical; (2) appellate courts have—notwithstanding the best of efforts and intentions—established a related body of law which regrettably is imprecise and frequently inconsistent; and (3) rational authority readily can be found both for and against the admissibility of challenged evidence in any questionable Fourth Amendment case.

The majority opinion, despite the obviously conscientious efforts of its able author to justify the result chosen by the majority, constitutes a legal smorgasbord of Fourth Amendment concepts. A large percentage of the factual situations and principles presented by the cases relied upon in the majority opinion readily may be distinguished from this case. In effect, the majority opinion fires an artillery shell at a target that calls for a marksman's rifle. With the majority opinion constituting 55 pages in length in slip opinion form, however, a detailed refutation thereof would be wholly infeasible.

In this case, in effect for want of a flashbulb, a convicted armed robber will evade justice. Suspicion was focusing upon appellant as the perpetrator of at least two assaultive thefts in the women's rest room at the Washington Monument. The detective in charge of investigating the offenses was summoned to the Monument grounds to see and photograph appellant, who had identified himself by name to other officers. Bad weather precluded acceptable photography, and appellant was taken to Park Police Headquarters. While there, he was photographed, an officer telephoned his school, and he was released.

To turn to the underlying proposition, the Fourth Amendment provides in pertinent part: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . .." Despite the suspicions which justified the investigative intrusion on appellant's wanderings at the Monument grounds that day, see, e. g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), there is no question but that there then was no probable cause for his seizure. Thus, his Fourth Amendment rights were violated. If any incriminating evidence had resulted from a search of appellant during his one-hour detention, assuredly it properly would have been suppressed as evidence. However, no evidence was seized; only appellant was. The majority thus initially faced an intractable dilemma: Appellant could not be suppressed. See e. g., Bond v. United States, D.C.App., 310 A.2d 221, 224–25 (1973). The trial court did suppress evidence of the photographic and lineup identifications of appellant which later were made.[1] Thus, the majority was left with only one remaining avenue of ordaining an adverse legal consequence to its disapproval of the conduct of the police: Suppress the testimony of the victim of the armed robbery, who had nothing to do with the improper detention and whose independent ability to identify her assailant was wholly unaffected thereby.[2]

The majority opinion is disingenuous in various respects. Illustrative of this is footnote 7 of the majority opinion. After citing (and quoting from) a case which is contrary to the majority's position, the majority seeks to distinguish it by stating: "Appellant receives no immunity by virtue of our

---

1. Having properly learned appellant's identity through their initial inquiry on the Monument grounds, the police readily could have photographed him at a later time in a number of permissible ways.

2. The dissent to the original majority opinion had as its basic theme the apparent belief that appellant's unwarranted investigative detention was a sham arrest. The current majority opinion affirmatively disavows the existence of a sham arrest. Additionally, it is noteworthy that the new majority opinion does not even hint (nor could it) that the victim's ability to identify her assailant resulted from any improper suggestivity.

decision in this case." In a hypertechnical, semantic sense, it might be arguable that "immunity" is not what the majority confers upon appellant. But as a practical matter, inescapably that is precisely what the majority does. If there were any valid authority or plausible rationale for the majority's ruling, it would not be necessary for the majority to lead us through such a misty Fourth Amendment wonderland. Stripped of its often anfractuous reasoning, the majority opinion reaches an extraordinary and unprecedented result. The innocent victim of a crime, whose independent ability to identify her assailant has been and remains undeniable, is to be deprived of her day in court because the constable blundered in a way which did not lead to the discovery or seizure of any evidence which was admitted at appellant's trial.

In *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), an unconstitutional search ultimately led to the use of uncoerced testimony by an independent witness. The defendant sought to suppress that testimony. The Supreme Court held that the testimony was admissible, stating in part:

> The cost of permanently silencing [the witness] is too great for an even-handed system of law enforcement to bear in order to secure . . . a speculative and very likely negligible deterrent effect.[3] [*Id.*, at 1062.]

Today, this court does not silence a disinterested witness whose testimony was indeed a consequence of an unconstitutional search (a result which the Supreme Court refused to sanction in *Ceccolini*), but rather permanently silences the victim of a crime whose ability to testify was unrelated in any way to the unconstitutional seizure of appellant. I join my Brother NEBEKER in expressing the hope that the only remaining reviewing authority will both have and seize the opportunity to reject the majori-

ty's manifestly unwarranted extension of the exclusionary rule.

I am authorized to state that Associate Judge NEBEKER shares these views.

---

3. In *Ceccolini*, the Court specifically reaffirmed what it said more than 50 years ago in *McGuire v. United States*, 273 U.S. 95, 99, 47 S.Ct. 259, 71 L.Ed. 556 (1927):

A criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule. [98 S.Ct. at 1061.]